## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

DEBRA L. WINTERS,                          )
                                           )
               Plaintiff,          )
                                           )
               v.                  )     Civil Action No. 09-460-CJB
                                           )
CAROLYN W. COLVIN,                         )
Commissioner of Social Security,           )
                                           )
               Defendant.          )
                                           )

---

Gary C. Linarducci and Steven L. Butler, LINARDUCCI & BUTLER, New Castle, Delaware;
David F. Chermol, CHERMOL & FISHMAN, LLC, Philadelphia, Pennsylvania, Attorneys for
Plaintiff.

David C. Weiss, United States Attorney, UNITED STATES ATTORNEY'S OFFICE FOR THE
DISTRICT OF DELAWARE, Wilmington, Delaware; Patricia A. Stewart, Special Assistant
United States Attorney; Eric P. Kressman, Regional Chief Counsel, Dina White Griffin, SOCIAL
SECURITY ADMINISTRATION, Philadelphia, Pennsylvania, Attorneys for Defendant.

---

### <u>MEMORANDUM OPINION</u>

November 7, 2013
Wilmington, Delaware

*Christopher J. Burke*

**BURKE, U.S. Magistrate Judge**

Plaintiff Debra L. Winters ("Winters" or "Plaintiff") appeals from a decision of defendant Carolyn W. Colvin, the Commissioner of Social Security ("the Commissioner"),[1] denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-33. The Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Winters and the Commissioner. (D.I. 8, 10) Winters asks the Court to reverse the Commissioner's decision and order benefits or remand for further proceedings. (D.I. 9 at 18; D.I. 17 at 9) The Commissioner opposes this motion and requests that the Court affirm the ALJ's decision. (D.I. 11 at 22) For the reasons set forth below, Winters' motion for summary judgment will be GRANTED-IN-PART and DENIED-IN-PART and the Commissioner's motion for summary judgment will be DENIED. The case will be remanded for further proceedings consistent with this Memorandum Opinion.

I.      **BACKGROUND**

A.      **Procedural History**

Winters filed her claim for DIB in March 2006, alleging disability beginning on November 14, 2003. (D.I. 5 ("Transcript" and hereinafter "Tr.") at 13, 101–05, 107–09; D.I. 11

---

[1]      Carolyn W. Colvin became the Commissioner of Social Security on February 13, 2013, after this proceeding was initially filed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin replaced the previous Commissioner, Michael J. Astrue, as the defendant in this case. *Malcom v. Colvin*, Civ. No. 12-584-SLR, 2013 WL 5365339, at *1 n.1 (D. Del. Sept. 25, 2013).

at 1) Her claimed period of disability runs through December 31, 2006, the date she was last insured for disability benefits. (Tr. at 13, 15)

Winters' application was denied initially on May 24, 2006, and was again denied on reconsideration on December 6, 2006. (Tr. at 13, 67-76; D.I. 11 at 1) On January 29, 2007, Winters filed a request for a hearing before an administrative law judge ("ALJ"). (Tr. at 77) The hearing was held on December 13, 2007. (Tr. at 22-62) On February 4, 2008, the ALJ issued a decision confirming the denial of benefits to Winters. (Tr. at 10-21) On April 3, 2008, Winters filed a request for review of the ALJ's decision. (Tr. at 6) On April 30, 2009, the Appeals Council denied that request. (Tr. at 1–5) Thus, the ALJ's decision denying DIB became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981; *see also Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

On June 24, 2009, Winters filed a Complaint in this Court seeking judicial review of the ALJ's February 4, 2008 decision. (D.I. 1) On November 11, 2009, Winters filed her motion for summary judgment. (D.I. 8) The Commissioner opposed Winters' motion and filed a cross-motion for summary judgment on December 10, 2009. (D.I. 10) Thereafter, the parties engaged in additional briefing regarding whether Winters could file an amended motion for summary judgment, (D.I. 12, 13, 14), a request that Winters later withdrew, (D.I. 16). Briefing on the motions currently before the Court was completed on April 18, 2012. (D.I. 17)

On March 21, 2012, this case was reassigned to Judge Richard G. Andrews. On March 28, 2012, this case was referred to the Court to hear and resolve all pretrial matters, up to and including the resolution of case dispositive motions. On April 20, 2012, the parties consented to the Court's jurisdiction to conduct all proceedings in this case. (D.I. 19)

3

## B.    Factual Background

### 1.    Winters' Medical History, Treatment, and Condition

At the time of the alleged onset of her disability in November 2003, Winters was 46 years old; she was 49 years old as of the date last insured in December 2006. (Tr. at 20, 24-25) Winters alleges that she became disabled on November 14, 2003 when she tripped and fell, fracturing the femoral neck of her right hip. (Tr. at 13, 33, 181–84)

#### a.    Medical Evidence Prior to Winters' Alleged Onset Date

Beginning in July of 1997, six years prior to the onset of her alleged disability, Winters sought treatment for headaches from Charles Reel, M.D. (Tr. at 272–74) Winters disclosed then that she had a history of depression and was currently being treated with anti-depressants. (*Id.*) On physical examination, Dr. Reel found Winters to be "notably anxious . . . with tremulousness." (Tr. at 273) Dr. Reel noted that Winters suffered from "increasing stress at work and at home" and stated that he believed Winters' headaches were "intimately related to her life stressors and depression." (*Id.*) Dr. Reel recommended that Winters continue to take her anti-depressant medications and prescribed medication for severe headaches. (Tr. at 274) In a follow-up visit two months later, Winters reported that she continued to suffer from headaches. (Tr. at 278)

On October 13, 1999, two years later, Winters returned to Dr. Reel complaining of an increase in the frequency of her headaches. (Tr. at 276) Dr. Reel noted that Winters was "followed by Dr. Kunkle for depression" and continued to take various anti-depressant medications. (*Id.*) Concerned about intracranial pathology, Dr. Reel ordered an MRI of Winters'

4

brain and suggested that Winters try a higher dose of Imitrex. (Tr. at 277) The MRI was normal. (Tr. at 232)

Nearly four years later, on May 5, 2003, Winters sought treatment for pain, numbness, and tingling in her right arm from the doctors at Southern Maryland Orthopaedic and Sports Medicine Center, including Daniel Bauk, M.D. and Michael Travis, M.D. (Tr. at 197) Winters reported to Dr. Travis that she suffered from "horrendous pain" in her right dominant arm with occasional swelling and stiffness. (*Id.*) Winters reported that she had a "both bone forearm fracture" in the past. (*Id.*) Dr. Travis noted that Winters had "significant problems with depression[,]" was taking "multiple medications" and had a "[b]izarre affect." (*Id.*) Dr. Travis found Winters' right hand to be shiny and contracted, and reported that Winters suffered from "[p]robable type 1 complex regional pain syndrome (reflex sympathetic dystrophy.)[.]" (*Id.*) He recommended that Winters seek evaluation by a pain service, (*id.*), and prescribed bracing for Winters' right arm, (Tr. at 270).

There is no evidence in the record indicating whether Winters sought evaluation by a pain service. However, on August 1, 2003, Winters was admitted to Saint Mary's Hospital in Maryland for an MRI of the distal right forearm, hand and cervical spine. (Tr. at 254–55) The MRI report of Winters' right forearm and hand indicated an old fracture on her wrist with no evidence of abnormality; the MRI suggested that Winters suffered from low bone mineral density, but was otherwise normal. (*Id.*)

Winters returned to Dr. Reel on August 29, 2003 for evaluation of right arm pain and numbness over the past year. (Tr. at 270–71) Noting Dr. Travis' report and the MRI report, Dr.

Reel suggested that Winters undergo an EMG/nerve condition study. (*Id.*) The results of the study and EMG of Winters' upper extremities revealed minimal right carpal tunnel syndrome and minimal left Guyons canal syndrome. (Tr. at 259) Dr. Reel prescribed Winters medication for nerve pain and recommended that she continue splinting her right wrist. (Tr. at 271)

### b.   Medical Evidence Subsequent to Winters' Alleged Onset Date

On November 14, 2003 Winters tripped and fell, suffering the right femoral neck fracture of her right hip. (Tr. at 181-84) That same day, Dr. Bauk performed an open reduction and internal fixation to repair the fracture. (*Id.*)

Winters returned to Dr. Bauk six weeks later complaining of pain in her right hip. (Tr. at 195; D.I. 11 at 7)[2] Dr. Bauk noted that Winters had not returned to see him for any previously scheduled post-surgery visits, and that she arrived to the appointment "full weightbearing on her leg" without the assistance of any kind of device. (Tr. at 195) An x-ray of Winters' hip indicated that it did not appear to be healed. (*Id.*) Dr. Bauk attributed this to Winters' noncompliance regarding her weight-bearing restrictions. (*Id.*) Dr. Bauk stated that Winters "must use the walker at all times" and limited her to "toe-touch weight-bearing only." (*Id.*)

On October 14, 2004, Winters returned to Dr. Bauk for a follow-up examination. (Tr. at 196) Winters complained of increasing pain in her right groin. (*Id.*) On physical examination, Dr. Bauk found Winters to have a "very labile affect[,]" stating that she went from "defiant to crying to very flat in rapid succession." (*Id.*) An x-ray of Winters' right hip showed advanced collapse of the femoral head due to osteonecrosis. (*Id.*) Dr. Bauk again attributed Winters'

---

[2]   There appears to be an error in the date listed on Dr. Bauk's notes regarding this visit; while the visit appears to have occurred six weeks after the November 14, 2003 surgery, the date on Dr. Bauk's notes regarding the visit is October 22, 2005. (Tr. at 195)

6

continued injury to her "complete[]" noncompliance with weight-bearing restrictions. (*Id.*) Dr. Bauk noted that the recommended treatment for Winters' condition was a total hip arthroplasty. (*Id.*) However, he indicated that he was not willing to proceed with the additional surgery unless he was certain Winters would be compliant with all restrictions, including weight-bearing restrictions. (*Id.*) No further records from Dr. Bauk are found in the record.

Shortly thereafter, on October 22, 2004, Winters began seeing a different orthopedic surgeon, Bruce Beck, M.D., for an orthopedic consultation to address increasing pain in her right hip. (Tr. at 191) Dr. Beck reviewed the x-rays taken by Dr. Bauk and concluded that Winters had a collapsing right femoral head. (Tr. at 192) Dr. Beck recommended that Winters undergo either a hemiarthroplasty or a total hip replacement, dependant on the appearance of the acetabulum. (*Id.*)

On November 29, 2004, just over a year since Winters' first surgery, Dr. Beck performed a right hemiarthroplasty on her. (Tr. at 189–90) On a follow-up visit nineteen days later, Dr. Beck reported that Winters had good range of motion, normal strength, no acute distress, and walked using a walker. (Tr. at 190) Dr. Beck recommended that Winters continue to ambulate and attend therapy. (*Id.*) On January 1, 2005, Dr. Beck reported that Winters was "getting along well" and Winters stated that she was "doing very well." (Tr. at 189) Although Dr. Beck noted that Winters walked with a "very slight limp[,]" he found her ability to ambulate "quite good." (*Id.*)

On February 25, 2005, Winters returned to Dr. Beck, complaining of pain in her right heel and ankle. (Tr. at 187–88) Winters reported that her ankle ached when she walked. (Tr. at 187) A physical examination revealed ankle swelling, puffiness, and pain to palpation in

7

Winters' right ankle and heel. (*Id.*) Dr. Beck found Winters' ankle was stable with normal motor strength and intact sensation. (*Id.*) An x-ray of the ankle did not show any injury; however, it did show mild generalized osteopenia (low bone mineral density). (Tr. at 188, 279) Dr. Beck recommended that Winters attend physical therapy. (Tr. at 188)

On follow-up examination with Dr. Beck on April 18, 2005, Winters reported that she had been attending physical therapy and felt her right ankle was improving, though it still occasionally bothered her. (Tr. at 186) Winters reported that she was not experiencing any pain in her right hip and was "very pleased with it." (*Id.*) Dr. Beck did not find any abnormalities in either Winters' right hip or ankle, but noted that she walked with a slight limp. (*Id.*)

On January 4, 2006, Winters was referred to an orthopedist, Bryan Herron, M.D., for consultation regarding hip pain. (Tr. at 209–10) Winters reported "aching, giving way, locking/catching pain, stiffness and swelling" in her right hip. (Tr. at 209) Winters described the pain as "inconsistent and aching[,]" that its severity was "moderate and worsening" and that it was a "10" on a "scale of 1 to 10[.]" (*Id.*) She also indicated that her symptoms worsened with movement of the right hip and with changes in the weather. (*Id.*) On physical examination of Winters, Dr. Herron found her to have normal gait and station, muscle tone, and range of motion. (Tr. at 209-10) Dr. Herron noted that Winters' muscle strength was "5/5 for all groups tested." (Tr. at 209) He found moderate tenderness in the greater trochanter of the right femur and right ala of the ilium. (*Id.*) Dr. Herron recommended that Winters "gradually increase activities as tolerated without restrictions." (Tr. at 210) He also recommended that she attend physical/occupational therapy. (Tr. at 210–11)

8

A request for physical/occupational therapy by Dr. Herron, dated January 4, 2006, diagnosed Winters with persistent trochanteric bursitis and abductor tendonosis in her right hip. (Tr. at 211) Dr. Herron listed that his goals for the therapy were to "improve function, increase strength, improve mobility, and relieve pain[.]" *(Id.)* An undated prescription pad note from Dr. Herron appears in the record immediately after the January 4, 2006 request form. This note, apparently written in this same time period, notes that Winters was limited to "lifting - 5 lbs pushing/pulling 10 lbs[.]" (Tr. at 212)

On May 24, 2006, Phillip Moore, M.D., a state agency physician, performed an Residual Functional Capacity ("RFC") assessment based upon his review of the record.[3] (Tr. at 199–206) Dr. Moore concluded that Winters could occasionally lift 20 pounds, frequently lift 10 pounds, could stand and/or walk for a total of six hours in an eight-hour workday, and could sit for a total of six hours in an eight-hour workday. (Tr. at 200) He also found Winters was unlimited in her ability to push and/or pull, and had occasional postural limitations. (Tr. at 200-01) Dr. Moore noted that Winters occasionally used a cane and that her complaints regarding her limited ability to lift and walk were credible. (Tr. at 204)

On June 23, 2006, Winters returned to Dr. Herron complaining of burning and sharp pain in her right hip. (Tr. at 208) Winters reported that these symptoms worsened with lifting, moving from sitting to standing, moving the affected area, standing, and walking. *(Id.)* Winters also reported: (1) that the pain was "sharp[;]" (2) that it "radiates to the back[;]" (3) that it was an "8" on a "scale of 1 to 10[;]" and (4) that it occurred on a constant basis anytime she used her

---

[3]     It should be noted that the RFC assessment completed by Dr. Moore listed "total right hip replacement" as the primary diagnosis for the assessment. (Tr. at 199)

hip. (*Id.*) Dr. Herron observed that Winters appeared tired and that her mood and affect was sad. (*Id.*) He reported that Winters had moderate tenderness in her right hip, right buttock, and sacral region. (*Id.*) Dr. Herron noted that he discussed activity restrictions with Winters, emphasizing the need for "gentle handling." (*Id.*) Dr. Herron reported that non-compliance with the treatment plan greatly increased the risk of a poor outcome. (*Id.*) Dr. Herron concluded that Winters' prognosis was "fair." (*Id.*)

On December 6, 2006, Irving Kramer, M.D., a state agency physician, reaffirmed the RFC completed by Dr. Moore. (Tr. at 213)

### c.  Medical Evidence Subsequent to the Date Last Insured

On March 26, 2007, Winters visited Odilon Claravall, M.D., for general medical care. (Tr. at 283–86) Winters disclosed a history of anxiety and tuberculosis. (Tr. at 283) Dr. Claravall diagnosed Winters with insomnia and generalized anxiety disorder and prescribed Xanax (at a later visit in September 2007, he prescribed Lexapro). (Tr. at 281, 286)

On May 21, 2007, a bone density scan ordered by Dr. Claravall revealed mild to moderate osteoporosis in the left femoral neck and left proximal femur and borderline osteoporosis in the lumbar spine. (Tr. at 292)

On June 2, 2007, Dr. Claravall completed a non-agency form entitled "Medical Assessment of Ability to Do Work Related Activities (Physical)." (Tr. at 215–17) Dr. Claravall found that, due to back pain, Winters could lift less than 10 pounds occasionally and less than 10 pounds frequently, could stand/walk for a total of six hours in an eight-hour workday, could sit for a total of six hours in an eight-hour workday, had limited ability to push and/or pull in her upper extremities, and could occasionally perform postural activities. (Tr. at 215–16) Dr.

10

Claravall noted that during an eight-hour workday Winters would need to rest or lie down. (Tr. at 217) He opined that the "level of severity reflected" had existed since Winters began seeing Dr. Herron. (*Id.*) On July 12, 2007, a prescription blank signed by Dr. Claravall stated "[p]atient is to do no exercise except for walking." (Tr. at 218)

## 2.    Administrative Hearing

At an administrative hearing on December 13, 2007, the ALJ heard the testimony of Winters and Janet Howard Reed ("Reed"), an impartial Vocational Expert ("VE"). (Tr. at 22–62)

### a.    Winters' Testimony

Plaintiff testified that she had prior work experience as a secretary and a bartender. (Tr. at 25–28) She stated that her work as a secretary was at her husband's company, from approximately 1996 through 2001, and said that she would occasionally provide extra help for an hour or two per day by answering phones. (Tr. at 27–28) With regard to her prior work as a bartender, this work involved standing, walking, and frequently lifting 15-20 pounds throughout an eight- to 12-hour work day. (*Id.* at 28–29) Winters testified that in recent years, after she broke her hip in November 2003, she was unable to return to the "rigorous routine" she had previously undertaken as a bartender. (Tr. at 29) In 2005, for example, she took a part-time job as a bartender, but after two months she left the job, because her impairments prevented her from performing her duties. (Tr. at 26–27) Winters testified that she was not able to work as a result of two surgeries performed on her right hip, problems with her wrist due to carpal tunnel syndrome, and depression. (Tr. at 29–31)

11

Winters stated that after the first surgery on her right hip she was able to ambulate, but was never able to walk correctly. (Tr. at 33–34) She reported using a walker after the first surgery for the "first couple of months[,]" followed by periodical use of a cane. (Tr. at 34) Winters said that during a follow-up examination, it was determined that the first surgery had not been successful and a second surgery was required. (Tr. at 34–35) Following the second surgery in November 2004, Winters reported initially feeling better, but gradually began to have problems performing tasks such as walking up stairs, lifting her infant grandson or lifting a laundry basket. (Tr. at 35–36)

At the time of the hearing, Winters testified that she continued to experience pain in her lower back and right hip and was currently seeing a physical therapist. (Tr. at 32) Winters reported that on an average day, the pain in her hip ranked between a six and a seven on a scale of 10, though it got better with medication. (Tr. at 37) Winters stated that the pain and pinching sensation in her hip worsened with changes in weather (when it could rate as high as a "nine and ten") or when she put weight on it, and that she had difficulty sitting for more than an hour or standing for more than two hours. (Tr. at 37–40) She said that her hip would often lock after periods of walking or standing. (Tr. at 38)

Winters testified that she had a cane that she would occasionally use if needed. (Tr. at 40) She said that she used a heating pad two to three hours a day to relieve her hip pain. (Tr. at 40–41) She also said that she was currently taking Tramodol for her hip pain which caused dizziness and prevented her from driving. (Tr. at 41) While her doctors encouraged her to exercise, Winters indicated that due to a recent diagnosis of osteoporosis, she was currently not permitted to do any exercise except for walking. (Tr. at 52–53)

12

Winters also testified that she has experienced pain in her lower back for at least two and a half years. (Tr. at 41–42) She described the pain as a five or a six on a scale of ten. (Tr. at 42) Winters said the pain was aggravated by activities such as bending over and bathing. (Tr. at 42–43)

With respect to her depression, Winters testified that she was currently being treated through her family physician and had not received any counseling. (Tr. at 53) She said that four months prior she began taking Lexapro for depression and said that she also took Xanax for anxiety. (Tr. at 30–31, 53) She described her mood as depressed, reported experiencing daily symptoms of anxiety, difficulty sleeping and deterioration in her appetite, and said that she can easily get upset and cry. (Tr. at 45–46, 53)

In regard to her carpal tunnel syndrome, Winters reported that she was prescribed a brace for her right wrist. (Tr. at 48) Winters testified that she was right-handed and that her right wrist would occasionally swell, and that she experienced a constant pinching or tingling sensation. (Tr. at 49)

Near the end of her testimony, Winters said that Dr. Herron, her "orthopedic surgeon[,]" had previously told her that she was limited to lifting no more than five pounds and to pushing and pulling no more than 10 pounds. (Tr. at 48) She further said that during periods of wrist pain, she cannot lift even a coffee cup. (Tr. at 48–49) Thereafter, the ALJ asked Winters some questions, and in doing so, referred back to Winters' statement that her "orthopedic doctor" had told her "to lift only five pounds[.]" (Tr. at 51) The ALJ asked Winters when she had been given this instruction. (*Id.*) Winters said that after her "surgery" she had difficulty lifting her grandson and called her "orthopedic" to ask if "there was any weight restrictions with the surgery

13

I had had." (*Id.*) Winters said this conversation occurred in 2004 (in a later portion of this questioning by the ALJ, she appeared to suggest that this conversation occurred in 2005, and then corrected herself, again noting that it had occurred in 2004). (Tr. at 51–52) Winters was asked if she had spoken to her orthopedist since then about the restrictions, and said she had. (Tr. at 52)

### b. The Vocational Expert's Testimony

VE Reed also testified at the hearing. (Tr. at 54–61) She noted that Winters had previously worked as a bartender, which was "semi-skilled and light" work with a specific vocational preparation ("SVP") of three or four.[4] (Tr. at 55) Reed further indicated that Winters' secretarial work at her husband's company was classified as a general office clerk, which was also "semi-skilled and light" with an SVP of three or four. (*Id.*) When asked if Winters would have any transferable skills resulting from her previous employment, Reed stated that Winters would have "very minimal clerical skills." (*Id.*)

The ALJ asked Reed to consider a hypothetical individual of Winters' age at disability onset, education level, and work history. The ALJ stated:

> I'd like for you [to] . . . assume a person who is 46 years of age on her onset date on her disability case. She has a 12th grade education plus one year of college[,] . . . . [a]nd the past relevant work as just indicated, right-handed by nature, suffering from various impairments as she has the effects of status post femoral neck fracture back in 11/03 with surgery. And subsequent surgery for partial hip replacement in 11/04. She also indicates in her testimony she has some carpal tunnel syndrome and a crooked wrist on the right[, a]nd some depression of late. She has been taking medicines for about four months, no treatment. She does have pain and discomfort and depression of a moderate nature.

---

[4]     "SVP" is a measure of the amount of a time required to learn the skills and satisfy the requirements to perform the type of work under consideration. *See, e.g., Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 851 n.6 (6th Cir. 2010).

14

> Occasional panic attack according to her testimony, somewhat
> relieved by her medications without significant side effects. But
> she indicates she derives dry mouth and some dizziness from one
> or a combination. And if I find . . . that she needs low stress jobs,
> low concentration, low memory, able to attend tasks and complete
> schedules, however, and would be mild to moderately limited in
> her ability to perform her ADL's, interact socially and to maintain
> concentration, persistence and pace. And if I find that she can lift
> 10 pounds on occasion, frequently 20 on occasion and stand for 20
> to 30 minutes; sit for 20 to 30 minutes on an alternate basis during
> an eight hour day five days a week, but would have to avoid
> heights and hazardous machinery due to her medications. And
> avoid temperature and humidity extremes and no prolonged
> climbing, balancing and stooping. And by that I mean no more
> than one or two per hour. Jobs that would not require any fine
> dexterity due to her carpal tunnel, but would seem to be able to do
> light work activities with her limitations. Are there jobs . . . that
> such a person can do in significant numbers out there in the
> national economy with those limitations?

(Tr. at 55-56) Reed testified that there were, and gave three examples of such jobs at the "light

exertional level": "packer[,]" "inspector[,]" and "unarmed security guard[.]" (Tr. at 56–59) She

stated that Winters would not be able to perform her past relevant work in the two types of jobs

that she previously held (as a bartender or general office clerk). (Tr. at 59)

When questioned by Winters' attorney, Reed testified that if a person were limited to

lifting less than 10 pounds, then one could not perform the jobs of a packer, inspector, and

unarmed security guard, because those jobs were at the "light" exertional level and required a

greater lifting ability. (Tr. at 60) When asked if Winters would be able to perform sedentary

work in a clerical position, Reed further testified that because Winters had minimal clerical skills

and was computer illiterate, Winters did not have transferable skills to perform such work. (Tr.

at 60–61)

### 3.    The ALJ's Findings

15

On February 4, 2008, the ALJ issued the following eleven findings:

> 1. The claimant meets the insured status requirements of the
> Social Security Act through December 31, 2006.
>
> 2. The claimant has not engaged in substantial gainful activity
> since November 14, 2003, the alleged onset date (20 C.F.R. §§
> 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).
>
> 3. The claimant has the following severe impairments:  right hip
> partial replacement and 2 surgeries; depression (20 C.F.R.
> 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of
> impairments that meets or medically equals one of the listed
> impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20
> C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and
> 416.926).
>
> 5. After careful consideration of the entire record, the undersigned
> finds that the claimant has the residual functional capacity to
> perform sedentary to light work, including lifting at least 10
> pounds, with occasional climbing, balancing, stooping, crouching,
> kneeling and crawling; and with mild/moderate
> concentration/depressive difficulty as a result of pain.
>
> 6. The claimant is unable to perform any past relevant work (20
> C.F.R. 404.1565 and 416.965).
>
> 7. The claimant has been a younger individual at all relevant times
> (20 C.F.R. 404.1563 and 416.963).
>
> 8. The claimant has at least a high school education and is able to
> communicate in English (20 C.F.R. 404.1564 and 416.964).
>
> 9. The claimant has acquired work skills from past relevant work
> (20 C.F.R. 404.1568 and 416.968).
>
> 10. Considering the claimant's age, education, work experience,
> and residual functional capacity, the claimant has acquired work
> skills from past relevant work that are transferable to other
> occupations with jobs existing in significant numbers in the

> national economy (20 C.F.R. 404.1560(c), 404.1566, 404.1568(d), 416.960(c), 416.966 and 416.968(d)).
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act from November 14, 2003 through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. at 13–21)

## II. STANDARD OF REVIEW

### A. Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil

Procedure 56. In determining the appropriateness of summary judgment, the Court must "review

the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-moving party' but

not weighing the evidence or making credibility determinations." *Hill v. City of Scranton*, 411

F.3d 118, 124–25 (3d Cir. 2005) (alterations in original) (quoting *Reeves v. Sanderson Plumbing*

*Prods., Inc.*, 530 U.S. 133, 150 (2000)). "The court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B. Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by

"substantial evidence[.]" *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Knepp v. Apfel*, 204 F.3d 78, 83

(3d Cir. 2000). "Substantial evidence" means less than a preponderance of the evidence but

more than a mere scintilla of evidence. *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir.

2005). The United States Supreme Court has explained that it "does not mean a large or

considerable amount of evidence, but rather such relevant evidence as a reasonable mind might

17

accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988) (internal quotation marks and citation omitted). The United States Court of Appeals for the Third Circuit has also held that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). "Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Id.*

In analyzing whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986). The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). Even if the reviewing court would have decided the case differently, it must defer to the ALJ and affirm the Commissioner's decision, so long as the decision is supported by substantial evidence. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Monsour*, 806 F.2d at 1190-91.

However, it is the ALJ's responsibility "to analyze all the evidence and to provide adequate explanations when disregarding portions of it." *Guerrero v. Comm'r of Soc. Sec.*, Civil Action No. 05-1709 (FSH), 2006 WL 1722356, at *3 (D.N.J. June 19, 2006) (internal quotation marks and citations omitted). "'[U]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

18

*Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978) (internal quotation marks and citation omitted). While there is no requirement that the ALJ discuss every piece of evidence in the record, as the fact finder, he or she is expected "to consider and evaluate the medical evidence in the record consistent with his [or her] responsibilities under the regulations and case law." *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001). Ultimately, "the Court must set aside the Commissioner's decision if the Commissioner did not take the entire record into account or failed to resolve an evidentiary conflict." *Ongay v. Astrue*, Civil No. 09-0610 RMB, 2010 WL 5463070, at *7 (D. Del. Dec. 29, 2010).

In addition to conducting an inquiry into whether substantial evidence supports the ALJ's determination, the Court must also review the ALJ's decision for the purpose of determining whether the correct legal standards were applied. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). The Court's review of legal issues is plenary. *Id.*

## III.   DISCUSSION

### A.   Disability Determination Process

Title II of the Social Security Act "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). In order to qualify for DIB, the claimant must establish that she was disabled prior to the date she was last insured. 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §

19

423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21–22 (2003).

To determine whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. 20 C.F.R. § 404.1520; *see also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of nondisability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii) (mandating a finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, then the Commissioner proceeds to step three, and must compare the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent meets or equals an impairment in the listings, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either by itself or in combination, fails to meet or

20

medically equal any listing, the Commissioner should proceed to steps four and five. 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201 (3d Cir. 2008) (internal quotation marks and citation omitted). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. 20 C.F.R. § 404.1520(g) (mandating a finding of non-disability when the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *Plummer*, 186 F.3d at 428. In other words, the ALJ must show that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* When making this determination, the ALJ must analyze the cumulative effect of all of claimant's impairments. *Id.* At this step, the ALJ often seeks the assistance of a VE. *Id.*

## B.     Winters' Arguments on Appeal

On appeal, Winters presents four arguments: (1) the ALJ did not properly evaluate

21

evidence of her mental impairments; (2) the ALJ failed to properly weigh the opinions of her

treating physicians, Dr. Herron and Dr. Claravall, with regard to lifting restrictions they imposed;

(3) the ALJ failed to properly assess her complaints of pain; and (4) the ALJ's "step five" finding

was in error.  (D.I. 9 at 3–4)  The Court will address these arguments in turn.

## 1.    Whether the ALJ Properly Evaluated Winters' Mental Impairments

Winters first contends that the ALJ failed to properly evaluate evidence of her mental

impairments and, in particular, her depression.  (D.I. 9 at 13–15)[5]  When there is evidence of a

mental impairment on the record, the Commissioner is required to follow a "special technique"

in evaluating the severity of that impairment.  20 C.F.R. §§ 404.1520a, 416.920a; *see also*

*Maddaloni v. Comm'r of Soc. Sec.*, 340 F. App'x 800, 802 (3d Cir. 2009).  The Third Circuit has

summarized this special technique as follows:

> This special technique requires consideration of whether the
> claimant has a "medically determinable mental impairment[ ]," and
> if so, "the degree of functional limitation resulting from the
> impairment[ ]."  [20 C.F.R.] § 404.1520a(b).  In assessing the
> degree of functional limitation, Regulation 404.1520a provides that
> four broad functional areas must be considered and each area must
> be rated on either a five- or four-point scale.  20 C.F.R. §
> 404.1520a(c)(3) and (4). . . .  If the claimant has a severe mental
> impairment at step two, subsection (d)(2) directs that at step three

---

[5]     Plaintiff argues that the ALJ should have assessed her anxiety (in addition to her depression) at this stage.  (D.I. 9 at 13-14)  The Court does not find error here, as Plaintiff did not clearly raise the issue of her anxiety in response to questioning at her hearing regarding "physical or mental impairments that [impact her] ability to work[.]"  (*See* Tr. at 29–31)  Where a plaintiff fails to raise the presence of an impairment at her hearing, despite direct questions to that effect, she cannot successfully argue that the ALJ erred in failing to consider that impairment.  *See Rutherford*, 399 F.3d at 552–53.  This is especially true where, as here, plaintiff fails to "specif[y] how that [impairment] would [further or differently] affect the [ ] analysis undertaken by the ALJ[.]"  *Id.* at 553; *see also* (D.I. 9 at 13–15 (plaintiff repeatedly linking together anxiety and depression in her briefing on mental impairments, without specifying how anxiety, taken alone, would have differently affected the ALJ's analysis)).

22

>the medical findings and ratings of the functional limitations must
>be further evaluated by comparing them to the criteria of the
>appropriate listed mental disorder in Appendix 1. *Id.* §
>404.1520a(d)(2).

*Maddaloni*, 340 F. App'x at 802. Then, if the mental impairment does not meet any "listing[,]"

the claimant's residual functional capacity is assessed. 20 C.F.R. §§ 404.1520a(d)(3),

416.920a(d)(3).

With regard to the step at which the Commissioner must rate the degree of functional

limitation resulting from the impairment, he must consider "all relevant evidence to obtain a

longitudinal picture of [the] overall degree of [such] limitation." 20 C.F.R. §§ 404.1520a(c)(1),

416.920a(c)(1). Functional limitation is "based on the extent to which [the] impairment(s)

interferes with [a person's] ability to function independently, appropriately, effectively, and on a

sustained basis." 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). The degree of functional

limitation is rated according to four areas: (1) activities of daily living; (2) social functioning; (3)

concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. §§

404.1520a(c)(3), 416.920a(c)(3). The first three areas are rated on a five-point scale: none, mild,

moderate, marked, and extreme. 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). The fourth area

is rated on a four-point scale: none, one or two, three, four or more. *Id.*

As to the step requiring the Commissioner to determine if an impairment meets a listed

mental disorder, the listings for mental disorders are arranged into nine "diagnostic categories[,]"

one of which, Listing 12.04, relates to "affective disorders[.]" 20 C.F.R. Pt. 404, Subpt. P, App.

1, § 12.00(A). Certain of these listings, including Listing 12.04, consist of: a statement

describing the disorder, paragraph A criteria (a set of medical findings), paragraph B criteria (a

set of impairment-related functional limitations) and paragraph C criteria (additional functional criteria). *Id.* at § 12.04.[6]

Winters takes issue with different aspects of the ALJ's decision making process in the evaluation of her depression. First, Winters argues that the state agency was required to analyze her depression using the special technique and to document the findings, but failed to do so. (D.I. 9 at 13) Second, Winters argues that the ALJ failed to utilize the special technique in the body of the decision, and failed to set out the "specific evidence . . . considered in reaching [the] conclusion" about the severity of her mental impairments. (*Id.*) Third, Winters argues that the ALJ failed to properly develop the record as to her mental health, in that the ALJ did not order a mental health assessment or independent consultative examination. (*Id.*; D.I. 17 at 1-2)

Winters' first argument is that the state agency was required to and failed to analyze and document her depression using the special technique. (*See* D.I. 9 at 13) The Commissioner responds by referencing two of Winters' "Disability Report[s]" submitted early in her DIB application process, noting that the reason for the lack of documentation was that Winters "never alleged that she was disabled due to a mental impairment" at the initial or reconsideration levels of review. (D.I. 11 at 15 (citing Tr. at 129-35, 147-52)) And indeed, review of these Disability Reports reveals that Winters singularly referenced limitations arising from her hip injury as being relevant to her disability, without any mention of mental impairments. (Tr. at 129-35, 147-52)

Where a mental impairment is identified in an adult, the state agency in the administrative

---

⁶       By way of example, the criteria of paragraph B in Listing 12.04 requires that the claimant's affective disorder result in at least two of the following: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration[.]"  20 C.F.R. § 404, subpt. P., App. 1, § 12.04.

review process generally must "complete a standard document to record how [it] applied the [special] technique." 20 C.F.R. §§ 404.1520a(e), 416.920a(e). There is no absolute requirement that an ALJ remand a case simply because this document was not completed, and standing alone, the ALJ's failure to remand here did not necessarily amount to error. *See Richards v. Astrue*, 370 F. App'x 727, 730-31 (7th Cir. 2010) (holding that there is "no absolute requirement that an ALJ remand a case simply because [the state agency's documentation of the special technique] was not completed at the initial or reconsideration level" where plaintiff claimed only an eye impairment in her initial application, but later submitted evidence that she suffered from the mental impairments of chronic depression and anxiety); *see also Loux v. Astrue*, No. 4:06CV01728 JTR, 2008 U.S. Dist. LEXIS 3793, at \*12 n.5 (E.D. Ark. Jan. 17, 2008).[7]

Winters' second argument is that the ALJ failed to utilize the special technique in the body of the decision, and failed to provide the "specific evidence . . . considered in reaching [the] conclusion" about the severity of her depression. (D.I. 9 at 13) In support, Winters asserts that the ALJ made "no reference to any evidence" in determining that her depression generated no more than "mild/moderate" restrictions in the areas in which the degree of functional limitation is measured, (*id.* at 14), and otherwise "simply stated his conclusions with no explanation at all[,]" (D.I. 17 at 1).

"An ALJ's failure to explicitly use the special technique may be harmless error[.]" *Richards*, 370 F. App'x at 730; *see also Jones v. Astrue*, 499 F. App'x 676, 676-77 (9th Cir. 2012) (holding that the district court was correct when it concluded that "no substantive

---

[7]     However, the absence of such documentation in the record further highlighted the need for additional record evidence regarding the limiting effects of Winters' depression. *See Richards*, 370 F. App'x at 730-31.

analytical error occurred" where the ALJ "did not adequately document his application of the special technique in his step two analysis, [but] included the requisite findings and conclusions in his step three analysis.") (internal quotation marks and citation omitted). However, just as with physical limitations, effective review of an ALJ's decision "cannot be performed unless the ALJ's decision reveals an analysis of the entire record and contains specific findings of fact to support the ALJ's conclusions." *Oliva v. Astrue*, Civil Action No. 10-2616, 2011 WL 3862216, at \*3 (E.D. Pa. Aug. 31, 2011) (citing *Jones v. Barnhart*, 364 F.3d 501, 504 (3d Cir. 2004)). "Conclusory findings are insufficient" and instead, the "ALJ must explain [his] findings . . . by citing evidence supporting [the] decision and the evidence [that was] rejected with an explanation of why [the ALJ] rejected it." *Oliva*, 2011 WL 3862216, at \*3.

The medical history regarding Winters' depression dates from the time prior to the period of claimed disability. It includes records from Dr. Reel from the late 1990s, and the May 2003 records of Dr. Travis, the latter of which note Winters' continuing "significant problems with depression" and "[b]izarre affect." (Tr. at 197, 272–74, 276) However, there is also indication that Winters' depression continued within the period of disability, including records from Dr. Bauk and Dr. Herron noting Winters' significant mood swings and changes in affect, as well as Winters' own testimony and her prescription records. (Tr. at 30–31, 50, 169–180, 196, 208) And there is evidence from 2007, just after the period of claimed disability, that Winters continued to seek medication for and assistance with depression. (Tr. at 30–31, 281–82)

In analyzing Winters' depression, the ALJ did not explicitly cite the requirements of the "special technique," nor did the ALJ explicitly address all of those requirements in the decision. The decision does, however, contain indication that the ALJ engaged in at least certain steps

26

required by the special technique. For example, the ALJ found the evidence of Winters'

depression was at least significant enough to constitute a "severe impairment[.]" (Tr. at 15) The

ALJ also addressed whether Winters' depression met the requirements of Listing 12.04 and

concluded that they did not, explaining:

> The claimant's depression does not meet both the "A" and either
> "B" or "C" criteria of Listing 12.04. With specific regard to the "B"
> criteria, this impairment does not result in at least two of the
> following: marked restriction of activities of daily living; marked
> difficulties in maintaining social functioning; marked difficulties in
> maintaining concentration, persistence or pace; or repeated episodes
> of decompensation, each of extended duration. In this regard, the
> record supports a finding that this impairment causes no more than
> mild/moderate restriction in the activities of daily living,
> mild/moderate difficulties with social functioning, mild/moderate
> difficulties in maintaining concentration, persistence and pace, and
> no episodes of decompensation of extended duration.
>
> As for the "C" criteria, there is no indication that the claimant has a
> medically documented history of a chronic affective disorder of at
> least 2 years' duration that has caused more than a minimal
> limitation of ability to do basic work activities, with symptoms or
> signs currently attenuated by medication or psychosocial support,
> and either: repeated episodes of decompensation, each of extended
> duration; a residual disease process that has resulted in such
> marginal adjustment that even a minimal increase in mental
> demands or change in the environment would be predicted to cause
> the claimant to decompensate; or a current history of 1 or more
> years' inability to function outside a highly supportive living
> arrangement with an indication of continued need for such an
> arrangement.

(Tr. at 16) And the ALJ determined that certain limitations stemming from this mental

impairment should be incorporated into Winters' RFC. (*See, e.g.*, Tr. at 20, 56))[8]

---

[8]     Winters asserts that the ALJ failed to translate the setting of paragraph B criteria
(for purposes of the analysis of Listing 12.04) into "detailed, function by function practical
language for the RFC or for the VE in any hypothetical questions." (D.I. 9 at 15); *see also* SSR
96-8p, 1996 WL 374184, at *4 (July 2, 1998). However, as the Commissioner notes, the ALJ's

Yet where the ALJ's opinion is lacking is in the absence of any explanation as to how these conclusions were reached. Social Security regulations require that the ALJ must "document application of the technique, incorporating [the] pertinent findings and conclusions based on [the] technique" and that the ALJ's decision must show "the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment[.]" 20 C.F.R. §§ 404.1520a(e)(3) & (4). These regulations were not followed here. For example, when it came to explaining *why* Winters' depression amounted to a severe impairment, but nevertheless did not meet the criteria of Listing 12.04, the ALJ did not cite to any medical evidence, nor provide any explanation as to how such evidence led to the ALJ's conclusion. (Tr. at 16) Nor did the ALJ provide any articulation as to the basis for the inclusion of certain depression-related limitations in Winters' RFC. Instead, as Winters notes, the ALJ merely listed his conclusions, without providing any window into how they were reached. (*Id.*) Such conclusions may well ultimately be justified. But the absence of any articulation of the basis for them (and the failure to explicitly

---

hypothetical question to the VE not only referenced Winters' "mild to moderately limited" ability to perform tasks in the areas listed in 20 C.F.R. § 404.1520a(c)(3), but the ALJ also did translate these limitations into functional language, when the ALJ said that Winters "needs low stress jobs, [and jobs requiring] low concentration, low memory, [but is] able to attend tasks and complete schedules[.]" (Tr. at 56 (cited in D.I. 11 at 16)) It is true that in the portion of the ALJ's decision that sets out Winters' RFC, the ALJ writes only that Winters had "mild/moderate concentration/depressive difficulty as a result of pain." (Tr. at 16) But when the ALJ made his finding of non-disability, he referred to the hypothetical question he asked the VE, noting that it included the "same . . . residual functional capacity as the claimant[.]" (Tr. at 20) That hypothetical question did provide more than a reiteration of the ALJ's paragraph B finding, instead setting out functional limitations relating to Winters' depression. *See Davis v. Comm'r of Soc. Sec.*, Civil Action No. 11-3036 (MLC), 2012 WL 2594354, at \*8 (D.N.J. July 5, 2012).

undertake the special technique before making these findings) leaves the Court unable to provide meaningful review.

In such a circumstance, remand is appropriate. *See, e.g.*, *Oliva*, 2011 WL 3862216, at *4-5, *10 (ALJ's determination of plaintiff's RFC and finding that claimant did not meet requirements of Listing 12.04 required remand where the ALJ "did not explain and point out the inconsistencies" in the medical evidence regarding claimant's depression, and provided only "summary conclusions"); *Carrasquillo v. Comm'r of Soc. Sec.*, Civil Action No. 09-1883 (JLL), 2009 WL 5178317, at *5-7 (D.N.J. Dec. 28, 2009) (remanding where the ALJ "fail[ed] to adequately explain his reasons for rejecting or discrediting conflicting evidence" in finding that plaintiff did not meet Listing 12.04); *Savage v. Barnhart*, No. Civ. 04-1478-SLR, 2006 WL 38919, at *10-11 (D. Del. Jan. 6, 2006) (remanding case to reexamine plaintiff's RFC and whether plaintiff qualified for a disability under Listing 12.04 where ALJ failed to explain "how he came to his conclusions" and "what evidence was discounted"). On remand, the ALJ should perform the special technique set forth in 20 C.F.R. §§ 404.1520a(e)(3) and 416.920a(e)(3). Assuming that this analysis results in a finding of a "severe mental impairment" at step two, the ALJ should set out the evidence considered and describe how that evidence impacts the ALJ's findings as to each of the remaining steps of the technique.

Winters' third argument is that the ALJ failed to further develop the record as to her depression (and should be required to do so on remand). In support, Winters cites 42 U.S.C. § 421(h) for the proposition that "in any case where there is evidence which indicates the existence of a mental impairment," an initial determination that a person is not under a disability shall be made only if the Commissioner of Social Security has made "every reasonable effort to ensure

that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable [RFC] assessment." (D.I. 17 at 1-2) However, an ALJ is granted "greater flexibility than other hearing officers[,]" *Plummer*, 186 F.3d at 433, and is not necessarily "required to employ the assistance of a qualified psychiatrist or psychologist in making an initial determination of mental impairment[,]" *id. See also Dougherty v. Astrue*, 715 F. Supp. 2d 572, 586 (D. Del. 2010). Instead, "[w]hen evaluating an alleged mental impairment, [a]n ALJ is entitled to remand a claimant's case for further review, to call a medical advisor for assistance with the case, or to proceed with a determination without the assistance of a medical advisor." *Dougherty*, 715 F. Supp. 2d at 586; *see also Kinsey v. Astrue*, Civil Action No. 11-301-RGA, 2012 WL 2879015, at *5-6 (D. Del. July 13, 2012).

The case of *Richards v. Astrue*, 370 F. App'x 727 (7th Cir. 2010), from the United States Court of Appeals for the Seventh Circuit, is similar to the facts here and demonstrates why further development of the record was warranted. In *Richards*, as here, plaintiff suffered from mental health problems, but those problems were not raised or examined at the initial or reconsideration levels. *Richards*, 370 F. App'x at 730-31. At the administrative hearing in *Richards*, as here, plaintiff put forward the issue of mental impairment, and the ALJ's decision found that plaintiff suffered from a "severe" mental impairment, but that she did not meet a listed impairment. *Id.* at 729. And, as here, the plaintiff in *Richards* argued that the ALJ drew conclusions based on an undeveloped record that included no state-provided medical professional opining on the limiting effects of plaintiff's depression. *Id.* at 731. The *Richards* Court held that:

30

> [W]ithout any medical professional having rated Richards's
> limitations in the areas of daily living, social functioning, and
> concentration, persistence, and pace, the ALJ assigned a rating of
> "mild" in each category. In the absence of any expert foundation for
> these ratings, we cannot discern the necessary logical bridge from
> the evidence to the ALJ's conclusions.

*Id.* Ultimately, the Seventh Circuit remanded the case and ordered the agency to reevaluate the

plaintiff's mental limitations and RFC with the benefit of an expert opinion. *Id.* at 733; *see also*

*Washington v. Colvin*, No. 12 C 4995, 2013 WL 1903247, at \*8-9 (N.D. Ill. May 7, 2013) (citing

cases).

As in *Richards*, here, there was a clear need for further development of the record

regarding the limitations that stemmed from Plaintiff's depression. The need was strong because

Winters' depression had been identified by numerous physicians and she has a significant history

of receiving anti-depressant medications, yet there is no evidence of record, including no records

from a psychologist or psychiatrist, indicating how that mental impairment would have affected

Winters' functional capacity for employment. (*See* D.I. 9 at 13-14; D.I. 11 at 14-15); *Plummer*,

186 F.3d at 434. Further development of the record "could have been accomplished either by

remanding the case for further development, by seeking medical assistance, or perhaps by

soliciting testimony directly from the claimant" as to how her depression-related symptoms

limited her functional ability to work. *Plummer*, 186 F.3d at 434. Thus, in re-examining the

impact Winters' depression had on her ability to work, the ALJ should further develop the record

on this psychiatric issue. *Plummer*, 186 F.3d at 434; *Kenny v. Astrue*, Civil Action No. 08-365-

JJF, 2010 WL 1780334, at \*6 (D. Del. Apr. 30, 2010) (remanding the case because, *inter alia*,

the ALJ "did not contact [p]laintiff's medical sources to further develop the record on her

31

condition and did not send [p]laintiff for a consultative examination[,]" even though plaintiff's

"mental condition ha[d] been acknowledged by numerous physicians" and plaintiff was "treated

with anti-depressant medication") (citing cases).

> ### 2. Whether the ALJ Properly Weighed Opinions of Winters' Treating Physicians

Winters next contends that the ALJ failed to follow the "treating physician doctrine" by

not giving sufficient weight to the opinions of two doctors—Dr. Herron, Winters' orthopedic

surgeon, and Dr. Claravall, Winters' primary care physician—particularly with regard to

Winters' limitations for lifting items. (D.I. 9 at 15–16; D.I. 17 at 2–6) Dr. Herron and Dr.

Claravall concluded, *inter alia*, that Winters could lift no more than five and 10 pounds,

respectively. (Tr. at 212, 215) The ALJ ultimately formulated Winters' RFC to include the

capability of lifting "10 pounds on occasion, frequently 20 on occasion[.]" (Tr. at 20, 56).

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord

treating physicians' reports great weight, especially 'when their opinions reflect expert judgment

based on a continuing observation of the patient's condition over a prolonged period of time.'"

*Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer*, 186 F.3d at 429); *see also*

*Dougherty*, 715 F. Supp. 2d at 580. The applicable Social Security regulations instruct that:

> Generally, we give more weight to opinions from your treating
> sources, since these sources are likely to be the medical
> professionals most able to provide a detailed, longitudinal picture
> of [a claimant's] medical impairment(s) and may bring a unique
> perspective to the medical evidence that cannot be obtained from
> the objective medical findings alone or from reports of individual
> examinations, such as consultative examinations . . . .

20 C.F.R. § 404.1527(c)(2); *see also Fargnoli*, 247 F.3d at 43; *Ongay*, 2010 WL 5463070 at \*9.

These regulations state that if a treating source's opinion as to the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it will be given "controlling weight." 20 C.F.R. § 404.1527(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at \*2 (July 2, 1996). If an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he or she must then determine what weight to give the opinion. The ALJ must do so by considering the following factors: length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, the degree to which the physician presents relevant medical evidence in support of the opinion, the consistency of the opinion with the record as a whole, the degree to which the opinion relates to an area in which the physician specializes, and any other factors "which tend to support or contradict the opinion." 20 C.F.R. § 404.1527(c)(2)-(6); *Ongay*, 2010 WL 5463070 at \*9.

Where a treating physician's opinion conflicts with that of a non-treating, non-examining physician, an ALJ may choose whom to credit but "'cannot reject evidence for no reason or for the wrong reason.'" *Plummer*, 186 F.3d at 429 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)). An ALJ may reject a treating physician's opinion as long as the rejection is due to contradictory medical evidence, rather than the ALJ's "own credibility judgments, speculation, or lay opinion." *Morales*, 225 F.3d at 317. When rejecting evidence, the ALJ "must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000); *see also* SSR 96–2p, 1996 WL 374188, at \*5 (July 2, 1996) (noting that reasons for allocating certain weight to

33

treating physician's opinion "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.").

Here, by way of example, the Court will focus on how the ALJ analyzed Dr. Claravall's opinion on the issue in dispute. On June 2, 2007, Dr. Claravall completed a form in which he addressed Winters' ability to sit, stand and manipulate items, and in which he also opined that: (1) the maximum weight Winters could lift and/or carry was less than ten pounds, regardless of frequency; and (2) Winters had limited pushing and/or pulling capability in her upper extremities.[9] (Tr. at 215–17) Dr. Claravall opined that the "level of severity reflected" in these limitations had existed since Winters began seeing Dr. Herron in 2006.[10] (Id.)

In the ALJ's decision, the ALJ wrote:

> The limitations as set out by Dr. Claravall, the claimant's primary care physician, in his assessment . . . except for those relating to the upper extremities (specifically, on limited ability for lifting/carrying, i.e., less than 10 lbs., and pushing/pulling) are consistent with the evidence of record and I concur with and find the same. . . . I reject the findings as to the upper extremities because they are not supported by the evidence of record. Therefore, the assessment findings by Dr. Claravall (except for those relating to the upper extremities) showing the claimant to have the exertional residual functional capacity for sedentary to light work, are accorded significant weight.

---

[9]     Dr. Claravall noted the primary reason for these restrictions was due to Winters' "back pain[.]" (Tr. at 215)

[10]     The ALJ's decision states that Winters first saw Dr. Herron in January 2005, (Tr. at 18), but this appears to be a mistake, as Dr. Herron's records and the Commissioner's briefing confirm that these visits did not begin until January 2006. (Tr. at 209–10; D.I. 11 at 9)

(Tr. at 19)  Thus, it appears that the ALJ concluded that all of Dr. Claravall's findings (other than those relating to Winters' ability to lift, carry, push and pull) to be well-supported by medically acceptable techniques and not inconsistent with other evidence of record—and that the ALJ gave them something approaching "controlling" (or at least significant) weight.  20 C.F.R. § 404.1527(c)(2).  However, the ALJ's rejection of Dr. Claravall's restriction on lifting less than 10 pounds is the focus here.[11]

In deciding how to evaluate this portion of Dr. Claravall's opinion, the ALJ, as noted above, was required to undertake a number of steps.  However, many of these were not explicitly followed.

For example, our Court has noted that an ALJ's decision not to give a treating physician's opinion controlling weight "must not automatically become a decision to give a treating physician's opinion no weight whatsoever."  *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008); *see also* SSR 96-2p, 1996 WL 374188, at *4 ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."); *Dougherty*, 715 F. Supp. 2d at 581.  Here, the ALJ did not specifically indicate what weight he afforded Dr. Claravall's opinion as to the lifting restriction, though the ALJ's "reject[ion]" of that portion of the opinion suggests that it was given no weight at all.  But in deciding what weight, if any, to give to the opinion, the ALJ was required to

---

[11]     In May 2006, Dr. Moore, the state agency physician, came to a different conclusion as to Winters' lifting ability, concluding that she could occasionally lift 20 pounds and frequently lift 10 pounds.  (Tr. at 200)  His report noted that Winters "[c]omplains of limited lifting . . . ability" and that these complaints were "[c]redible."  (Tr. at 204)  The report did not cite to any other medical evidence specifically relating to the lifting limitations.

balance the factors set out in 20 C.F.R. § 404.1527(c)(2)-(6).  Yet the ALJ did not explicitly do so in a manner subject to review.[12]  Indeed, the only one of these factors that could be said to have been referenced in the ALJ's decision was the "consisten[cy of the treating physician's] opinion with the record as a whole[.]"  20 C.F.R. § 404.1527(c)(4); *see also* (Tr. at 19).

Additionally, if the ALJ intended to utilize certain of these factors in rejecting the treating physician's opinion, the ALJ was required to "give some indication of the evidence that he rejects and his reason(s) for discounting that evidence."  *Fargnoli*, 247 F.3d at 43; *see also* SSR 96–2p, 1996 WL 374188, at *5.  Yet here, the ALJ simply stated that Dr. Claravall's opinions on this score were rejected because "they are not supported by the evidence of record[,]" (Tr. at 19), without clearly indicating what evidence was being referred to or why it was allegedly contradictory to other record evidence.

If the Court could otherwise infer what evidence the ALJ was referring to and determine that it supported the ALJ's conclusion, remand may not be required.  But here, it is difficult to discern exactly what evidence the ALJ was pointing to.  One inference could be that the ALJ was referencing the content of three subsequent citations the ALJ made to certain medical records (two of which are to Dr. Claravall's own records)—citations that appear in the ALJ's decision just after the ALJ's conclusion as to Winters' lifting abilities.  The Commissioner seems to agree that this is what the ALJ was referring to, as it cited to these very references as the ALJ's

---

[12]     At an earlier point in the ALJ's decision, the ALJ stated that "[t]he undersigned also considered opinion evidence in accordance with the requirements of 20 C.F.R. [§] 404.1527 [and] SSR[] 96-2p . . . ."  (Tr. at 17)  This is the only arguable reference to the content of Section 404.1527(c)(2)-(6) in the decision.

"expla[nation] why [the ALJ] gave Dr. Claravall's opinion significant weight except for the limitations he identified related to Plaintiff's upper extremities (Tr. 19)." (D.I. 11 at 18)

The difficulty with that argument is that none of those citations provide a clear, understandable basis for discounting Dr. Claravall's opinion as to Winters' lifting limitations. In the first citation, the ALJ writes: "In a prescription pad leaf dated December 12, 2007, Dr. Claravall notes the claimant 'is to do no exercises except for walking[.]'" (Tr. at 19 (citing Tr. at 218))[13] If anything, however, this reference is to an indication of significant limitation, not ability. The next citation is to an August 2003 medical record, indicating, *inter alia*, that Winters manifested no serious limitations regarding her wrists or her spine at the time—but this record dates from months prior to the beginning of the period of claimed disability and years prior to Winters' 2006 visits with Dr. Herron (the time period that Dr. Claravall cited as the onset for the lifting limitation). (Tr. at 19) And the last citation is to a record of a "[c]linical examination" by Dr. Claravall in March 2007, which the ALJ describes as being "essentially within normal limits[.]" (Tr. at 19) However, there is no indication in the ALJ's decision as to whether these examination results had any relationship to Winters' ability to lift items, or even if the ALJ intended to cite the examination in relation to the ALJ's view as to that particular limitation.[14] Thus, since these citations do not provide support (or at least support that is readily apparent,

---

[13]     The reference to December 12, 2007 appears incorrect, as the note in question is dated July 12, 2007. (Tr. at 218)

[14]     The underlying notes from that examination are in the record, but are handwritten and difficult to decipher. (Tr. at 285–86)

without further explanation by the ALJ) for the ALJ's rejection of the lifting restriction, the Court cannot rely on them to find that any error here was harmless.

Ultimately, the ALJ's decision to reject Dr. Claravall's lifting limitation was important. This is because the VE indicated that if Winters could lift no more than 10 pounds as Dr. Claravall (and Dr. Herron) indicated, then Winters would not be able to work in any of the three occupations that the ALJ found Winters was capable of performing (as part of the ALJ's finding that Winters was not disabled). (Tr. at 20–21, 55–60) Each of those occupations were in the "light" work category, which requires the ability to lift more than 10 pounds. (Tr. at 57-60); 20 C.F.R. § 404.1567(a)-(b) (noting that "[l]ight work" requires "frequent lifting or carrying of objects weighing up to 10 pounds" and "involves lifting no more than 20 pounds at a time" while "[s]edentary work[,]" in contrast, involves "lifting no more than 10 pounds at a time"). The VE acknowledged that if it turned out that a hypothetical person with Winters' other limitations could not, in fact, lift more than 10 pounds, this would "eliminate" these three occupations as options for Winters, "because [the jobs were] light [work]." (Tr. at 60)

Therefore, the Court finds that the ALJ erred in applying the relevant legal standards to the facts of this case by failing to properly weigh Dr. Claravall's opinion as a treating physician regarding Winters' lifting limitations, and by crediting the opinion of a non-treating and non-examining medical expert over Dr. Claravall's opinion without justification.[15] *See, e.g., Ongay*,

---

[15]     Although the Court has focused on Dr. Claravall's opinion, were it to address Dr. Herron's opinion as to lifting limitations, the decision would be no different. Although the only record of Dr. Herron's description of a specific limitation on lifting items is found on a note on an undated prescription pad leaf (one reading: "lifting - 5 lbs pushing/pulling 10 lbs[,]"), (Tr. at 212)), the parties do not seem to seriously dispute that this restriction was imposed by Dr. Herron at or around the time of Winters' first visit with him in January 2006. The Commissioner does

2010 WL 5463070, at *10-11 (remanding case because the ALJ rejected treating physicians'

opinions without addressing the factors set forth in Section 404.1527(c) regarding the weight to

be afforded those opinions, and because the ALJ provided insufficient explanation as to why the

treating physicians' opinions were rejected); *Eskridge v. Astrue*, 569 F. Supp. 2d 424, 437-38 (D.

Del. 2008) (remanding the ALJ's decision, because it was "unclear" to the Court whether the

ALJ considered a treating physician's opinion, where the ALJ summarized the opinion, but did

not explain the reasons why the opinion was or was not adopted, or the weight it was afforded).

The Court must therefore remand the case to permit the ALJ to apply the factors in 20 C.F.R. §

404.1527(c)(2)-(6), to explain whether the treating physicians' opinions that are at issue here

(including the lifting limitation) will be given controlling (or some other amount of) weight, and

to permit the ALJ to provide an adequate explanation for rejecting or accepting these opinions.

*See Solomon v. Colvin*, C.A. No. 12-1406-RGA-MPT, 2013 WL 5720302, at *12 (D. Del. Oct.

22, 2013); *Ongay*, 2010 WL 5463070, at *11.

---

not contest that Dr. Herron's opinion on this score is that of a "treating physician." (D.I. 11 at
16-18) Dr. Herron examined Winters for complaints of hip pain in January 2006 and again in a
follow-up visit in June 2006. (Tr. at 208–09) In the ALJ's decision, the ALJ noted that in the
initial consultation, Dr. Herron wrote that Winters "was to gradually increase activities as
tolerated without restrictions." (Tr. at 19 (emphasis in original) (citing Tr. at 210)) The
Commissioner argues that because Dr. Herron concluded that Winters should increase activities
"without restrictions" in the future, the ALJ must have determined that this evidence
"contradicts" Dr. Herron's "opinion restricting Plaintiff to lifting five pounds and pushing and
pulling ten pounds[.]" (D.I. 11 at 17) Yet because the ALJ did not clearly set out the rationale
for discounting Dr. Herron's opinion (or Dr. Claravall's similar opinion), it is difficult to know
whether this assumption is correct. (It is also difficult to know how, if at all, the ALJ viewed Dr.
Herron's later June 2006 requirement that Winters "comply" with "[a]ctivity restrictions"—after
Winters continued to complain of severe hip pain and after she explained to Dr. Herron that
"lifting worsens" the condition.). (Tr. at 208) Without a better explanation as to the rationale for
the ALJ's decision in this regard, the Court cannot meaningfully review the ALJ's findings.

### 3. Whether the ALJ Properly Evaluated Winters' Subjective Complaints of Pain

Winters next challenges the ALJ's determination of her RFC, arguing that he failed to

properly evaluate her subjective complaints of pain by (1) failing to identify which clinical

findings regarding Winters' pain or which of Winters' statements about her pain were deemed

"not credible" and by failing to "refute them with specific contradictory evidence or inferences";

and by (2) failing to properly develop the record or provide specific rejection of Winters' 2003

diagnosis of reflex sympathetic dystrophy affecting her right forearm. (D.I. 9 at 16–17)[16]

The Court will focus primarily on the first issue.[17] Social Security regulations establish a

two-part process that an ALJ must follow when assessing subjective symptoms. First, in

evaluating a claimant's statements about pain, an ALJ must identify "medical signs and

laboratory findings which show that [a plaintiff has] a medical impairment(s) which could

reasonably be expected to produce the pain . . . alleged[.]" 20 C.F.R. § 404.1529(a); *Hartranft*,

---

[16]     In her reply brief, Winters largely raises new arguments not presented in her
opening brief, regarding the ALJ's failure to consider the severity of impairments including
Winters' right wrist fracture, carpal tunnel syndrome, left Guyon's canal syndrome and probable
complex regional pain syndrome. (D.I. 17 at 6–7) The Court finds that these arguments were
waived for failure to raise them in the opening brief, and will not address them here. *See
McKesson Automation, Inc. v. Swisslog Italia S.p.A.*, 840 F. Supp. 2d 801, 803 n.2 (D. Del. Jan.
12, 2012); *LG Display Co., Ltd. v. AU Optronics Corp.*, Civil Action Nos. 06-726-LPS, 07-357-
LPS, 2010 WL 5463305, at *4 (D. Del. Dec. 29, 2010); *see also* D. Del. LR 7.1.3(c)(2).

[17]     As to the second issue, the ALJ's duty to further develop the record is triggered
when the record reveals evidentiary gaps resulting in prejudice to the claimant, or where the
medical records at issue contain a conflict or ambiguity that must be resolved. *Bell*, 218 F. Supp.
2d at 593. As the Commissioner notes, (D.I. 11 at 20), the record does not appear to indicate that
Winters ever asserted that she was disabled due to reflex sympathetic dystrophy. Moreover,
Plaintiff fails to articulate the rationale as to why the ALJ should have further developed the
record here, or what such development would have shown. (D.I. 9 at 16–17; D.I. 17 at 6-7) For
these reasons, the Court discerns no error as to this claim.

181 F.3d at 362 ("Allegations of pain and other subjective symptoms must be supported by objective medical evidence."). This is because a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled[.]" 20 C.F.R. § 404.1529(a); *see also id.* § 404.1528(a). Instead, while a claimant's "statements about the intensity and persistence of [her] pain or other symptoms" must be given serious consideration, those statements must also be "consistent with the medical signs and laboratory findings[.]" *Id.* § 404.1529(a).

Second, if the ALJ finds that there is objective medical evidence that could reasonably be expected to produce the claimant's expressed pain symptoms, then the ALJ must evaluate the intensity and persistence of the symptoms and the extent to which those symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(c)(1); *Johnson v. Astrue*, Civil Action No. 09-023-LPS, 2011 WL 4498948, at \*10 (D. Del. Sept. 27, 2011). When complaints of pain are supported by medical evidence, "the complaints should then be given great weight and may not be disregarded unless there exists contrary medical evidence." *Mason*, 994 F.2d at 1067–68 (internal quotation marks and citation omitted); *Johnson*, 2011 WL 4498948, at \*10.

On the other hand, at this second stage, the ALJ may reject subjective testimony of pain if the ALJ does not find it credible, so long as the reasons for the ALJ's credibility finding are grounded in the evidence and articulated in his decision. *See Johnson*, 2011 WL 4498948 at \*10 (citing SSR 96-7p, 1996 WL 374186, at \*4–5 (July 2, 1996)); *Wimbley v. Massanari*, No. CIV. A. 99-616-GMS, 2001 WL 761210, at \*6 (D. Del. June 21, 2001). This necessarily requires the ALJ to decide the extent to which the claimant "is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft*, 181 F.3d at 362. In making this determination, the ALJ can weigh such factors as the claimant's daily activities; location,

41

frequency, and intensity of the pain and other symptoms; precipitating or aggravating factors;

effectiveness and side effects of medication the claimant takes; and measures that the claimant

uses to relieve pain or other symptoms. *See* 20 C.F.R. § 404.1529(c)(3); *see also Johnson*, 2011

WL 4498948 at *10 (citing SSR 96-7p, 1996 WL 374186, at *3).[18]

In the present case, the ALJ found that Winters suffered from the following severe

impairments: (1) right hip partial replacement and two surgeries; and (2) depression. (Tr. at 15)

At the hearing, Winters testified about her pain symptoms, including how they related to her hip

problems and how that pain had limited her ability to, *inter alia*, lift items. (Tr. at 35-43, 48-49)

The ALJ ultimately determined that "[Winters'] medically determinable impairments could

reasonably be expected to produce the alleged symptoms, but that [Winters'] statements

concerning the intensity, persistence, and limiting effects of these symptoms are not entirely

credible." (Tr. at 18) Although the ALJ's decision does not explicitly state that Winters'

allegations of pain are one of the "symptoms" to which it is referring, the Commissioner

acknowledges that this statement was, in part, a reference to Winters' allegations of pain. (D.I.

11 at 18) The Court will therefore proceed under that assumption.

The difficulty here is that the ALJ's decision specifically references almost none of

Winters' hearing testimony. Thus, the Court is left without the ability to determine or infer what

pain-related portion of that testimony the ALJ might be referring to—or how the rejection of

---

[18]     An ALJ's credibility determination is entitled to deference and should not be
discarded lightly, particularly given the ALJ's opportunity to observe an individual's demeanor.
*Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). "Credibility determinations are the
province of the ALJ and only should be disturbed if not supported by substantial evidence."
*Gonzalez*, 537 F. Supp. 2d at 657 (internal quotation marks and citation omitted).

such statements impacted the ALJ's ultimate disability findings. *See Tell v. Comm'r of Soc. Sec.*,

Civil Action No. 11-cv-15071, 2012 WL 3679138, at *11 (E.D. Mich. July 13, 2012) (finding

ALJ's credibility analysis to be "beyond any meaningful appellate review" in part because "the

ALJ did not even identify which of Plaintiff[']s statements he found not credible"); *Griemsmann*

*v. Astrue*, No. C08-1592-TSZ, 2009 WL 3459856, at *3 (W.D. Wash. Oct. 23, 2009)

("Notwithstanding the Commissioner's effort to discern a reasonable justification to find

plaintiff's subjective complaints not fully credible, plaintiff correctly notes that the ALJ failed to

specifically identify what testimony was not credible . . ."); *Middlemas v. Astrue*, Civil Action

No. 08-621, 2009 WL 578406, at *5 (W.D. Pa. Mar. 5, 2009) (finding ALJ's statement that

plaintiff's "medically determinable impairments could have been reasonably expected to produce

the alleged symptoms, but that [his] statements concerning the intensity, persistence and limiting

effects of these symptoms are not entirely credible" to be "so conclusory as to be beyond

meaningful review").[19]

---

[19]    The ALJ's reference to Winters' hearing testimony consists of only three
sentences. (Tr. at 18) It is possible that in finding Winters' "statements" were "not entirely
credible[,]" the ALJ was referring back to the last of the three sentences regarding Winters'
testimony that the ALJ referenced in the decision: "[Winters] testified she could not lift 5 lbs.
because her Dr. told her that in 2003 or 2004[.]" (*Id.*) The ALJ next went on to cite portions of
the medical record from December 2004 through April 2005—after Winters' second surgery in
November 2004, but before her hip pain again grew severe by the time of her January 2006 visit
to Dr. Herron—in which Winters' physicians repeatedly noted that her hip pain was
"tolerable[,]" and that she was in "no acute distress" and had "minimal pain[.]" (*Id.*) Thus, it
could be that the ALJ was citing these portions of the medical record as a way to show that when
Winters testified at the hearing that her orthopedist told her after her November 2004 surgery that
she should not lift more than five pounds, (Tr. at 51–52), this does not gibe with medical records
from 2004-2005 indicating that Winters was not having great hip pain or distress in that time.
(Although the ALJ was in the best position to make this credibility determination, it is also worth
noting that Winters could simply have made a mistake in listing 2004 as the time period when
she was first told by her orthopedist not to lift more than five pounds. Just minutes before
answering the ALJ's question about the year in which she *received* this advice, Winters appeared

This failure is error that also requires remand.  On remand, to the extent that the ALJ discounted some portion of Winters' pain-related testimony, and that this had an impact on the ALJ's disability calculus (such as the ALJ's decision as to Winters' lifting limitations), the ALJ should more explicitly state the testimony at issue, the reasons for discounting it, and how, if at all, this impacts the ALJ's ultimate disability determination.

### 4.     Whether the Step Five Finding Was Supported by Substantial Evidence

Lastly, in her opening brief, Plaintiff took issue with the ALJ's "step five" finding (i.e., with the ALJ's determination as to whether Winters' limitations preclude her from adjusting to any other available work).  Specifically, Winters referenced back to her prior arguments regarding the ALJ's failure to properly evaluate her mental impairments, the lifting limitations set by her treating physicians and her pain-related complaints.  (D.I. 9 at 17)  Winters then argued that the failure to properly evaluate these impairments led to a "faulty RFC," such that the hypothetical question the ALJ posed to the VE was not "complete[.]"  (*Id.*)  Therefore, according to Plaintiff, the VE's answer "did not meet the Commissioner's burden to produce evidence of jobs Ms. Winters could perform, at step five."  (*Id.*)  Put another way, this last argument was an offshoot of Winters' three prior arguments—if the ALJ erred in any of those previously-identified respects, that error infected the hypothetical that was propounded to the VE, and that in turn rendered the ALJ's finding at step five erroneous.  The Commissioner answered this line of

---

to state that the orthopedic surgeon that *gave her* the advice was Dr. Herron.  (Tr. at 48)  Since Dr. Herron did not see Winters until January 2006, he could not have first given her this advice in 2004.).  In any event, since it is not clear what the ALJ was referring to here, remand is appropriate to clarify this issue.

argument, asserting that for the reasons it had previously stated, the ALJ had not erred, and (relatedly) that the ALJ's hypothetical question was not problematic. (D.I. 11 at 20–21)

The Court has found error, requiring remand, as to each of Winters' three prior arguments. It need not address this fourth argument, as the extent to which the ALJ's hypothetical question would (or would not) be affected by certain of the previously-referenced errors is not yet clear, and will become clear only after the ALJ provides additional explanation on remand as to the basis for portions of the decision. *See, e.g., Jagodzinski v. Colvin*, No. 12-2509-SAC, 2013 WL 4849101, at *5-6 (D. Kan. Sept. 11, 2013); *Tuter v. Astrue*, No. 2:11-CV-01474-KJN (TEMP), 2012 WL 1131533, at *10 (E.D. Cal. Mar. 29, 2012).[20]

## IV. CONCLUSION

For the reasons set forth in this Memorandum Opinion, Winters' motion for summary judgement is GRANTED-IN-PART and DENIED-IN-PART and the Commissioner's motion for summary judgment is DENIED. The Court DENIES Winters' request that the Court award her benefits, but will remand for further proceedings consistent with this Memorandum Opinion. An appropriate Order will issue.

---

[20] In Winters's reply brief, she also makes new arguments. There, for the first time, she argues that: (1) the ALJ's actual RFC finding was less robust than the hypothetical question posed to the VE; and (2) the VE hypothetical was less restrictive than the ALJ's RFC finding in certain ways, such that the VE's testimony could not provide substantial evidence to support the ALJ's decision. (D.I. 17 at 7–9) Because any reasonable reading of these arguments indicates that they are new arguments, not included in Winters' opening brief, the Court finds that she has waived those arguments and will not entertain them here. *See McKesson Automation*, 840 F. Supp. 2d at 803 n.2; *LG Display*, 2010 WL 5463305, at *4; *see also* D. Del. LR 7.1.3(c)(2).